F. W. WOOLWORTH CO., Plaintiff-Appellant,

v.

Henri A. MEIS, Trustee under Agreement dated December 26, 1945, known as the Blanche Meis Trust, Defendant-Appellee.

No. 13670.

United States Court of Appeals
Seventh Circuit.

Oct. 22, 1962.

Rehearing Denied Nov. 20, 1962.

Howard E. Kane, Chicago, Ill., Clyde Meachum, Danville, Ill., Anan Raymond, Thomas W. McNamara, Chicago, Ill., Thompson, Raymond, Mayer & Jenner, Chicago, Ill., Foreman, Meachum & Clapper, Danville, Ill., of counsel, for appellant.

Robert Z. Hickman, Danville, Ill., Horace E. Gunn and Gunn, Hickman and Kesler, Danville, Ill., of counsel, for appellee.

Before HASTINGS, Chief Judge, and KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

This is a diversity declaratory judgment suit by the tenant, Woolworth, for a declaration that defendant landlord was bound under a lease to pay the cost of installation of a heating unit made necessary by discontinuance of the previous heating system. The court, without a jury, decided against Woolworth and it has appealed.

For many years prior to 1953, Woolworth rented from the landlord the first floor of the Daniels building and connected basement space of the adjoining Milner Hotel in Danville, Illinois. The Illinois Power Company furnished steam heat to both buildings. Woolworth paid for its share of the steam, measured by a meter installed by the landlord. In

March, 1953, the hotel building was partially destroyed by fire, and the Daniels building suffered minor damage.

The lease in question was made July 1, 1953, for a term of twenty-five years, covering the first floor of the Daniels building and the first floor of the hotel.

Woolworth, under Article 15 [1] of the lease, substantially rebuilt the leased premises. The Power Company continued to furnish steam heat and Woolworth continued paying its share of the cost. In 1957, the Power Company notified Woolworth that, with permission of the Illinois Commerce Commission, distribution of steam would be discontinued effective June 1, 1960. Shortly thereafter, Woolworth installed a heating unit at a cost of $14,565.58.[2] Its suit is for a declaration that the landlord has the burden of the cost of that unit.

The District Court decided that the landlord had no obligation to install and pay for the heating plant. Woolworth claims the court erred in finding that the parties intended that the landlord should not have that duty; and in refusing to apply Illinois law in its favor.

It is agreed that the principle of decision in this case is the intention of the parties. Although Woolworth seeks to confine the basis for determining that intent to the lease itself, it introduced testimony of the negotiations between the parties, and the testimony was relied on by the District Court in determining the question of intention.

The evidence submitted by both parties is that twice in Woolworth's preliminary drafts of the lease, its "superintendent of real estate" [3] submitted a proposal that the landlord furnish, at landlord's expense, seventy-two degree heat from September 15 to May 15 each year, and that twice the landlord refused to accept the provision. The result was Article 18 of the lease which provided for continuation of the preexisting arrangement under which the Power Company furnished the heat, paid for by Woolworth, and the landlord installed and connected the meter. Testimony for the landlord was that this change in the preliminary drafts was to avoid the heating obligation. There was also testimony that Woolworth's preliminary draft sought to put on the landlord the obligation "to make and pay for all necessary repairs to the heating plant." That provision was "unacceptable" to the landlord and was not in the final draft of the lease. There is testimony too that Woolworth's superintendent of real estate and his predecessor, in memoranda, construed the lease as imposing no greater burden of heating than the landlord previously had, and that Woolworth had the burden of maintaining "the heating plant."

The court inferred from the foregoing substantial evidence that the landlord had refused to be obligated for the heating; that the landlord's state of mind was known to Woolworth; that it drew the lease in the light of that knowledge; and that the provisions of the final draft reflected the landlord's state of mind. We think the inferences are not clearly erroneous.

Based on those inferences, the District Court concluded that the parties did not intend that landlord should have the duty of installing or paying for the heating plant. We see no error in this conclusion. It was unnecessary for the court to find, as argued by Woolworth, that the parties "formulated" a mutual intention with respect to future heating. It was enough

1. Woolworth agreed to make, at its expense, "such alterations, additions and changes * * * as it deems necessary or convenient to fit the same for its occupancy * * *." The agreement covered extensive structural alterations, virtual reconstruction of the hotel building, and included among other specific things "year around air conditioning and ventilation."

2. Said installation was pursuant to a stipulation between the parties that it would be without prejudice to the present litigation.

3. He had charge of Woolworth's leases of over two hundred locations in three states.

if there was substantial evidence that the landlord expressed the intention not to be bound and that Woolworth's conduct implied the intention that the landlord was not to be bound.

We see no merit to the argument that the court should have found that even if the landlord had no obligation to furnish heat "as long as the utility was supplying it" the obligation arose when the Power Company's services ceased. The evidence was "we didn't want to have *any* obligation to furnish heat." (Emphasis added.) And the landlord's agreement to install the meter is another indication of the intention of the landlord not to assume an obligation for heating that did not exist under the prior lease. Finally we see no merit in the contention that the District Court erred in refusing to find that the installation of the heating unit came within Article 22 [4] of the lease so as to impose on the landlord the cost of complying with the order permitting a discontinuance of the steam service. The District Court properly found that there was no order directing either party here to install the unit.

Since we think the conclusion of law based on the inferences from the undisputed facts is not erroneous, we are of the opinion that the court did not err in refusing to apply the decision in Kaufman v. Shoe Corporation of America, 24 Ill.App.2d 431, 164 N.E.2d 617 (1960), a "first impression" case, in favor of Woolworth in the case at bar. Woolworth's principal reliance is upon that case.

In view of the District Court's inferences and conclusions, there is little essential similarity between that case and this. There a landlord sought to impose on tenant the cost of installation of a heating unit made necessary by the permissive order of the Illinois Commerce Commission that the Illinois Power Company could discontinue service. The Illinois Appellate Court reversed a judgment for the landlord, on the ground that installation of the heating equipment, under a proper construction of the lease, was not the tenant's obligation. The rule applied in Kaufman was that a tenant's lease obligation to repair does not cover structural or substantial alterations or additions made necessary by extraordinary or unforeseen events not in contemplation of the parties at the time of leasing; and that the landlord is ordinarily liable for those substantial alterations or additions.

It is important to note that the Kaufman rule was established where there was no expressed or implied intention of the parties on the heating subject in question. The court there was restricted to the confines of the lease itself and there was no testimony of preliminary negotiations. There was no evidence of intention and no basis for inferring that the parties had ever contemplated that the question would arise. The essential distinction between Kaufman and the case at bar is that here we have evidence and findings of the intention of the parties. The testimony here shows that the landlord contemplated having no obligation for future heating and stated that an obligation to repair the heating plant was "unacceptable." This embraced any future event, and Woolworth knew it, or should have known it at the time the lease was made. We cannot read the Kaufman case as making it incumbent upon the landlord to expressly exempt himself in the lease from such a liability where there is substantial evidence of intention. This substantial evidence renders the rule of ordinary liability of the landlord in that case inapplicable.

We have considered all points and arguments necessary for our decision. We

4. Article 22 provides in part: "The Landlord agrees that if any federal, state or municipal government or any department or division thereof * * * has ordered or required or shall hereafter order or require any rebuilding, alteration or repair thereof or installation therein, the Landlord will immediately at Landlord's own cost and expense rebuild or make such alterations, installations and repairs as may be necessary to comply with such laws, orders or requirements. * * *"

hold that the District Court was correct in deciding that the landlord had no obligation to pay for the heating plant.

For the reasons given, the judgment is affirmed.

SWYGERT, Circuit Judge (dissenting).

In Kaufman v. Shoe Corp. of America, 24 Ill.App.2d 431, 164 N.E.2d 617 (1960), as in the present case, the leased premises had been heated by steam purchased by the tenant from the Illinois Power Company. After the utility notified the parties that it was going to discontinue steam heat service, the parties installed a heating unit subject to judicial determination whether it was the obligation of the landlord or the tenant to pay for the installation. There was no lease provision as to heat. The lease did provide that the tenant was to keep the premises in good repair; however, it specifically exempted the tenant from making any structural repairs. The court ruled that where a tenant agrees merely to repair, he does not bind himself to make future additions of a structural nature made necessary by unforeseen future events not within the contemplation of the parties when the lease was made. The burden of these unforeseen expenses falls ordinarily on the landlord.

In holding the landlord in Kaufman liable for the cost of the heating plant made necessary by the Power Company's action, the court went on to say:

> "A general covenant of the tenant to repair, or to keep the premises in repair, merely binds him to make the ordinary repairs reasonably required to keep the premises in proper condition; it does not require him to make repairs involving structural changes. *In order to shift on the tenant a burden which would naturally fall on the landlord, the warrant for the change should be plainly discoverable in the lease.*" (Emphasis supplied.)

Since we are bound under Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to follow Illinois decisional law, the pertinent question is whether the facts in the present case are legally distinguishable from Kaufman.

Before discussing the facts, however, a further observation seems appropriate. It is my view that the rule laid down in Kaufman should not be given the narrow interpretation which the Court here seems to give it. I see the rule as having a much broader application and would hold that the requirement of the rule that "the warrant for the change should be plainly discoverable" applies with equal force to any evidence admitted at trial relating to the intention of the parties.

Although there is a clause in the lease involved in the present case that obligates Woolworth to purchase and pay for the steam it uses for heating and which required the landlord to install a meter, there is no express provision that indicates who has the obligation to install a heating unit. It is evident from the record that in the negotiations of the parties prior to the execution of the lease the real bone of contention was whether the landlord or the tenant should purchase the steam from the Power Company. Woolworth wanted the landlord to purchase the steam from the utility and supply heat to Woolworth at Woolworth's expense. The landlord objected. Woolworth acceded to the landlord's view and agreed to contract directly with the Power Company.

The fact that the provision in the original draft of the lease requiring the landlord to make repairs to the heating plant was deleted from the final draft at the insistence of the landlord does not, in my opinion, justify an inference that the parties intended that Woolworth was to install a heating plant. Kaufman recognizes that an obligation to repair, strictly speaking, has nothing to do with the installation of a new structural addition. This requirement in the printed original draft was obviously superfluous and inappropriate since there was no heating plant in the building at the time the lease was made.

Similarly, the printed provision in the original draft of the lease requiring the landlord to furnish heat at a fixed temperature during seven months of each year was superfluous and inappropriate since the landlord had no control over the supply of steam being used. Naturally the landlord did not want to guarantee heat when he had no control over its supply. But this does not mean that it was understood by the parties that, should the Power Company discontinue service, the landlord would have no obligation to furnish another source of heat as distinguished from furnishing the heat itself. Therefore, the deletion of this provision does not give rise to an inference that Woolworth was to install a heating plant should unforeseen circumstances require this structural addition to the premises.

The District Court buttressed its finding of the requisite intent by referring to Article 15 of the lease in which Woolworth was authorized to make such alterations, additions, and changes to the premises as it deemed necessary. Reference to pertinent parts of this article shed light on how it should be interpreted so as to ascertain the true intention of the parties.

The first portion of Article 15 reads:

"Within thirty (30) days from the delivery of this lease, the Tenant agrees *to proceed with reasonable diligence at its cost and expense, to make such alterations, additions and changes* to the demised premises as it deems necessary or convenient *to fit the same for its occupancy*, included but not limited to the following, remove second, third, and fourth floors of that portion of the premises at 11–13 W. Main Street, formerly known as the Milner Hotel property, converting the same to a one-story and basement building; remove partitions on the ground floor converting the entire demised premises into a single enlarged salesroom, extending the ground floor and basement into the present light court areaway; furnish and install year-round air conditioning and ventilation; furnish and install new store fronts across the front of the ground floor of the demised premises with stainless steel entrance doors, all in accordance with Tenant's plans and specifications * * *." (Emphasis supplied.)

The lease was signed on July 1, 1953. The Illinois Power Company did not notify Woolworth until June 17, 1957 that it had been granted permission by the Illinois Commerce Commission to discontinue heating service in Danville effective June 1, 1960. In order to operate its business, Woolworth had to make structural changes to the burned-out portions of the building and also had to *fit the same for occupancy*. It is evident that the only intention expressed in this article is that the construction work necessary to permit Woolworth to occupy the premises as a store was to be performed at Woolworth's expense and for this the landlord was to reimburse Woolworth. This work had to be carried out before the store was suitably fit for occupancy. Woolworth was to proceed with "reasonable diligence" to complete the work and:

"*Upon completion of such alterations, additions and changes and the opening of Tenant's store for business in the entire demised premises, the Landlord agrees within fifteen (15) days after demand therefore, to reimburse the Tenant* in the amount of One Hundred Forty Thousand ($140,000.) Dollars, toward the cost of such work." (Art. 15.) (Emphasis supplied.)

Clearly, this article anticipated only such structural changes as were necessary to fit the premises for occupancy. It is uncontradicted that for many years after occupancy a furnace was not needed since a public utility was supplying the heat. I fail to see how this article, limit-

ed as it is as to time, can show intention as to who was to have the burden of installing a furnace should future events make such installation necessary.

It is admitted that neither party during the course of the negotiations referred to the possible cessation of service by the Illinois Power Company. It is also admitted that Woolworth never stated that it would install a heating unit if one became necessary. Furthermore, it is noteworthy that Woolworth made no provision in its design specifications for future installation of a furnace in the renovated building. Finally, there is no evidence that Woolworth was aware of the rumor that the Illinois Power Company was going out of business. If this rumor was in the mind of the landlord, it was never the subject of the negotiations which the parties had prior to the execution of the lease.

The District Court relied solely on inferences gleaned from the nuances of language in the lease provisions and the prior negotiations of the parties in finding a mutual intention that Woolworth is obligated to install the heating plant. These inferences, in my opinion, are far too tenuous to warrant a determination, implicit in the finding, that the shift of the landlord's burden to the tenant is "plainly discoverable" either in the lease itself or in the prior negotiations of the parties.

In applying the rule of Kaufman, which I think is necessary, I fail to see how the defendant in the instant case carried its burden of showing that the parties intended plaintiff to assume the normal obligation of the landlord to make a major structural addition to the leased premises. Accordingly, I believe the District Court's finding as to the intention of the parties is clearly erroneous.

For these reasons I respectfully dissent. I would reverse.